Hon. John D. Quinn Director The New York State Lottery
Your counsel has asked whether an individual in the State of New York directly or through a charitable or other not-for-profit organization may dispose of valuable real estate by means of a raffle. The answer is no.
Section 9 of Article I of the State Constitution provides that "except as hereinafter provided, no lottery or the sale of lottery tickets, * * *, or any other kind of gambling, * * *, shall hereafter be authorized or allowed within this state" (subd [1]). A raffle is a form of gambling; indeed, a "raffle" is defined as "[a] kind of lottery" (Webster's New International Dictionary, Second Edition, Unabridged). Therefore, a raffle of a piece of property is not allowed within the State unless one of the exceptions is applicable.
There are four exceptions: "lotteries operated by the state" (ibid.); "pari-mutuel betting on horse races" (ibid.); "bingo or lotto" (id., subd [2]); and "games in which prizes are awarded on the basis of a winning number or numbers * * * determined as the result of * * *, a drawing or otherwise by chance" (ibid.). A raffle comes within the last exception. In the case of all four exceptions, there must first be legislative authorization. In each case, there are restrictions on what the Legislature may authorize.
There are two constitutional restrictions on the Legislature which preclude a raffle of real estate of more than nominal value, both of which exclude such a raffle by an individual and one that excludes such a raffle by a charitable or other not-for-profit organization. A raffle and other "games of chance" may be conducted only by "bona fide religious, charitable or non-profit organizations of veterans, volunteer firemen and similar non-profit organizations" (ibid., par [1]). "[N]o single prize shall exceed two hundred and fifty dollars" (ibid., par [3]). Thus, under no circumstances could the Legislature authorize anyone in New York State to raffle off a piece of real estate of a value in excess of $250.
The Legislature has authorized games of chance ("Games of Chance Licensing Law", General Municipal Law, Art 9-A). However, section 186 (3) defines "games of chance" to exclude games that are covered by the definition of "lottery" as contained in section 225.00 of the Penal Law. That section provides:
 "`Lottery' means an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value" (subd [10]).
"Unlawful" means "not specifically authorized by law" (ibid., subd [12]). Since a raffle comes within this definition, the Legislature has decided that no raffle, no matter what the value of the prize, may take place in New York.
Under the Penal Law, knowingly advancing or profiting from unlawful gambling activity is a Class A misdemeanor (§ 225.05). Receiving, in connection with a lottery, more than $500 played in one day, is a Class E felony (§ 225.10). Possession of writings or papers used in a lottery is a misdemeanor or felony depending upon the number of plays represented by the writings or papers (§§ 225.15 and 225.25). We note also that a transfer of title to real estate by means of a lottery is void, hence the winner does not take good title (General Obligations Law, § 5-415).
We conclude that it is unlawful in the State of New York to raffle off a parcel of real estate.
The term "consensus", absent a formal definition by those who use it, means an agreement accepted by more than a simple majority but not necessarily by all. A formal definition of the word does not invalidate decisions made prior to its adoption.
Dated: July 30, 1981
Hon. William C. Hennessy Commissioner Department of Transportation
Your Counsel has requested our opinion concerning the meaning of "consensus" and the validity of resolutions adopted by the Binghamton Metropolitan Transportation Study Policy Committee ("Committee") prior to November 2, 1979.
Your Counsel has advised us that the Committee acts by "* * * a consensus rather than a majority voting procedure". This procedure is called for by the Unified Operations Plan for Transportation Study Policy Committees in the State. On November 2, 1979, the Committee amended the requirement as it applies to the Binghamton Metropolitan Area to provide that "consensus" means "* * * no more than one negative vote cast." The amendment was enacted in response to questions by committee members regarding the meaning of "consensus".
There is no New York State case law that defines consensus. Neither is the word defined in any statute. Labor Law, § 202 (f) is the only New York statute using the word "consensus". The subdivision authorized the New York Board of Standards to adopt such "national consensus standards" as the Board deemed necessary. The term was not defined, but seemingly was used to give the Board the broadest possible latitude because of a then-recent fire tragedy which necessitated emergency measures. (Letter from Harry J. O'Connell, First Deputy Commissioner, Department of Commerce, to Honorable Michael Whiteman, Counsel to the Governor, May 11, 1973.) The vagueness of "national consensus standards" implies neither a formal count nor unanimity.
Professor Blevins, in his Dictionary of American Government andPolitics, states that consensus means:
 "General agreement by members of a social and political system on the fundamentals of government
or social values, structures, and actions" (1973, p 54, emphasis in original).
As in the other uses of the word, there is no mention of either unanimity or a specific vote. An authoritative definition of consensus from a non-legal source is: a collective opinion, general agreement (Funk Wagnall's Standard Dictionary of the English Language, InternationalEdition).
Since consensus does not require unanimity nor any specified super-majority, it is clear that a consensus may be declared without the formality of a recorded vote. Rather, the presiding officer assesses the measure of agreement reached and declares the presence of consensus. If objections are raised, discussion simply continues until the presiding officer's determination is accepted. As long as this informal procedure is used, a presiding officer is entitled to accept something less than unanimity. If the group is small, one or two strong dissenters can destroy consensus; if the group is large, a dozen strong dissenters might still leave consensus intact.
The resolution adopted by the Committee on November 2, 1979, defining consensus as present when there is no more than one negative vote cast, is appropriate in that it constitutes a practical guide to the Committee in identifying a consensus when it exists.
Moreover, the fact that the resolution now calls prospectively for the highest degree of consensus short of unanimity in Committee actions does not cast any doubt on the earlier actions of the Committee. The earlier absence of a precise guideline to assist the Committee in identifying the existence of a consensus does not give rise to any inference that a consensus declared by the Committee in its pre-November 2 actions did not in fact exist.
We conclude that "consensus" among those involved means an agreement that is accepted by more than a simple majority but not necessarily by all. If a group subsequently defines "consensus" precisely, decisions previously taken are not invalidated.